JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | | |
|---|---|---|
| TRUSTEES OF THE OPERATING<br>ENGINEERS PENSION TRUST, ET<br>AL. | ) | Case No. CV 09-1476 CAS (VBKx) |
| | ) | |
| Plaintiffs, | ) | **FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW** |
| | ) | |
| vs. | ) | |
| | ) | |
| SMITH-EMERY COMPANY; | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## I.     INTRODUCTION

On March 29, 2009, plaintiffs Trustees of the Operating Engineers Pension Trust, Trustees of the Operating Engineers Health and Welfare Fun, Trustees of the Operating Engineers Vacation Holiday Savings Trust, and Trustees of the Operating Engineers Training Trust (collectively, "Trustees") initiated this suit to collect trust fund contributions from defendant Smith-Emery Company ("SEC"), pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132(g) and 1145. Dkt. No. 1.  The gravamen of plaintiffs' complaint is that defendant has failed to make all of its required fringe benefit remittances to the Trusts, based on a series of collective bargaining agreements ("CBA") that defendant entered into with the International Union

of Operating Engineers, Local Union No. 12 ("Local 12").

On November 2, 2012, the Court issued its ruling on the parties' cross motions for summary judgment.  Dkt. No. 129 ("MSJ Order").

In the MSJ Order, the Court found that the results of a 2006 arbitration proceeding between Local 12 and SEC did not collaterally estop SEC from claiming that certain work is or is not covered by the CBA.  Second, the Court found that the scope of the parties' agreement is, in general, defined as "all field work inspection by licensed or registered Building/Construction Inspectors of concrete, steel, masonry work and non-destructive and/or grading inspection . . . ."  Ex. 1 at 2.  This phrase was (and will be) referred to as the "Coverage Definition."  The Court found that the crucial question is determining what work, as a matter of custom and practice, has been performed by a licensed or registered Building/Construction Inspector ("BCI") employed by SEC, and that SEC would owe contributions to the trust funds for the performance of this covered work, whether or not the work was performed by SEC employees classified as BCIs.  The text of the CBAs, and Appendix B to the agreement, which sets forth an illustrative list of covered work, are, of course, the starting point for this inquiry.

As to the various categories of work included in plaintiffs' revised audit, the Court found that (1) spray-applied fireproofing, (2) high strength bolting, (3) water control inspection, and (4) steel shop inspection are covered work.  All of these types of work are expressly set forth in Appendix B.  Second, based on the deposition testimony of James Partridge, SEC's President, the Court found that "torque testing" and "anchor bolt testing" are covered work.  Third, the Court found that material disputes of fact remained as to whether the remaining categories of work identified in plaintiffs' audit are covered.  These were adhesion/cohesion, proof load testing, pull testing, epoxy

dowels, steel framing and backing, expansion bolt inspection work, building inspection, project inspection, and lab tech away.

The Court further found that material disputes of fact existed with respect to the statute of limitations; cash disbursements in Parts I and K of the audit; the issue of contributions for holiday time; and inspection work performed on several public works projects for the Los Angeles Unified School District, which comprised part H of the audit.  The Court granted summary judgment in plaintiffs' favor on the issue of travel time in part B of the audit.

Thereafter, the Court held a bench trial in this action from December 11 to December 14, 2012, and from December 18 to December 19, 2012.  Subsequently, plaintiffs and defendant each filed a closing argument brief on February 11, 2013.  Plaintiffs also filed an Evidentiary Brief, and defendant filed a Motion to Strike.  Each party filed a response to the respective evidentiary briefs on February 22, 2013.  After considering the parties' arguments, the Court finds and concludes as follows.

## II.    FINDINGS OF FACT

1.    To the extent necessary, each of these findings of fact may be deemed to be a conclusion of law.

2.    To the extent that these findings depart from the Court's prior order granting in part and denying in part plaintiffs' motion for summary judgment and denying defendant's motion in its entirety, the findings in the instant judgment control, as they follow from the evidence presented at trial.  <u>See</u> Fed. R. Civ. P. 54(b) ("[A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.").

3.    In brief, plaintiffs claim that SEC failed to pay mandatory contributions to various trust funds under the terms of a series of collective bargaining agreements

between SEC and Local 12.  After initiating this suit, plaintiffs conducted an audit of the available books and records, which is the basis for their claims.

After various revisions, the following sections of the "revised audit" remain:  Part A of the audit makes a claim for clerical errors that resulted in contributions not being paid.  Part B covers contributions that are owed for time spent by otherwise covered employees traveling outside of Southern California.

Third, Parts E, F, and G encompass contributions that are owed for the work performed by non-union subcontractors on three hospital projects.  Part E covers work performed for the Los Angeles County–USC Medical Center project; Part F pertains to the UCLA Medical Center project in Santa Monica; and Part G covers work on the UCLA Medical Center project in Westwood.  Ex. 523-1.  The types of work for which plaintiffs are making a claim in these parts are styled as: (1) adhesion/cohesion inspection; (2) steel shop inspection; (3) torque test; (4) high strength bolt; (5) fireproofing; (6) lab tech away; (7) pull test; and (8) epoxy dowel inspection.

Finally, Parts I and K assert that SEC made "cash disbursements" to various non-union inspection subcontractors who performed inspection work for SEC within Local 12's jurisdiction, and that contributions should have been paid for these disbursements.

## A.   Background

4.     Smith Emery Company ("SEC") is over 100 years old and has performed construction inspection work on a number of major projects throughout California, including the Los Angeles Coliseum and the new San Francisco-Oakland Bay Bridge. RT 12/13pm, 86:1–10.  SEC employs Building/Construction Inspectors ("BCIs") to complete these inspection tasks.

5.     BCIs are individuals who perform various inspection and testing activities during the construction of occupied structures.  RT 12/18, 64:19–65:1.  Determining what comprises the duties of a BCI is the subject of the instant lawsuit.

6.      BCIs can obtain certifications in various disciplines, including reinforced concrete, pre-stressed concrete, structural masonry, and spray-applied fireproofing, among others, by passing an examination offered by the International Code Council.  RT 12/11, 41:24–42:16.  After obtaining a certification in a particular discipline, some jurisdictions (such as the City of Los Angeles) offer licenses in these disciplines, which permit the inspector to perform inspections within that jurisdiction.  "Deputy BCIs" are individuals who have obtained a certification and a license to act as a building inspector for that particular jurisdiction in a particular field; these inspectors are called "deputy building inspectors" in the City of Los Angeles.  RT 12/14, 23:4–9.

7.      Laboratory technicians are individuals under the employ of a materials testing laboratory who perform various materials tests on construction projects.  RT 12/18, 54:2–13.  According to witnesses for both parties, these individuals are also known as "field materials testers."  RT 12/12, 111:3–6; RT 12/18 54:12–13.

8.      Smith Emery Laboratories ("SEL") is a separate corporate entity that was formed in 1999.  RT 12/13pm, 88:16–18.  Formerly, it was a division of SEC.  James Partridge, President of SEC and SEL, testified (as did others) that there was no change in the way in which SEL employees operated after the separation into two corporate entities.  RT 12/13pm, 90:18–93:22, 95:13–96:1; RT 12/14, 75:8–20.  And both before and after the separation into two different legal entities, SEL sent lab personnel into the field to perform certain work on construction projects.  RT 12/14, 74:11–75:7.

9.      At trial, Partridge testified that lawsuits arising out of the Northridge earthquake were the impetus for incorporating SEL as a separate corporation, as these suits threatened to force the company into bankruptcy.  Partridge noted that Judge Carolyn Kuhl of the Los Angeles Superior Court found that SEC and SEC's licensed BCIs who were sued individually were immune from suit, on the grounds that SEC's deputy or licensed BCIs performed the same function as the building inspectors employed by the City of Los Angeles, and therefore should be entitled to the same

governmental immunity.  RT 12/14, 21:19–23:16.  Although the inspectors and laboratory personnel had always operated out of separate departments, on the advice of counsel, SEC decided to spin off the laboratory department as a separate company to avoid "clouding" the immunity afforded to the deputy BCIs.  RT 12/13pm, 94:18–95:3; RT 12/14, 23:22–24:5.

10.    Currently, SEC employs BCIs but no laboratory technicians.  SEL, on the other hand, does not employ BCIs, but employs laboratory technicians who sometimes perform work in the field.  RT 12/13pm, 86:12–18, 88:14–15.

**B.    National Labor Relations Board Certification and Collective Bargaining Agreements**

11.    In 1969, the NLRB certified "all field inspectors in [SEC's] Los Angeles Physical Testing Department, including deputy concrete inspectors, deputy structural steel inspectors and deputy masonry inspectors."  Ex. 244-4; RT 12/13pm, 85:10–14. This certification specifically excluded "all office clerical employees, professional employees, laboratory employees, guards and supervisors as defined in the [National Labor Relations Act]."  Ex. 244-4.  Thereafter, Local 12 and SEC entered into a series of collective bargaining agreements ("CBAs").

12.    Since its inception, SEL has never been a signatory to any CBA with Local 12 or any other union.

13.    From 1976 until 2004, Partridge was either a participant in or in charge of negotiations with Local 12 over the collective bargaining agreement between these parties.  RT12/13pm, 96:16–97:1.  Thereafter, Gregory Wolflick, one of defendant's attorneys in the present action, served as lead negotiator.

14.    All three CBAs relevant to this litigation are three-year agreements, beginning on August 1 of 2001, 2004, and 2007.  Exs. 1, 2, and 3.

15.    It is undisputed that SEC is not a signatory to the Master Labor Agreement ("MLA"), which is a collective bargaining agreement between Local 12 and the

1   Southern California Contractors Association ("SCCA").  RT 12/12, 96:16–97:1.  See Ex.
2   99 (Master Labor Agreement for 2007–2011).  The MLA contains various job or wage
3   classifications listed in three groups, two of which the parties argue are relevant here.
4   "Group I" includes a classification called "Field Soils and Materials Tester," among
5   other types of work.  "Group II" includes most or all of the categories expressly listed in
6   SEC's CBA—reinforcing steel, reinforced concrete, pre-tension concrete, post-tension
7   concrete, structural steel and welding inspector, and other similar job descriptions.  Ex.
8   99–111.  The parties agree that the testing work claimed by plaintiffs in this litigation
9   would be covered work under the MLA, but they dispute whether SEC's CBA also
10  covers this work.

11          16.     In 2004, Local 12 proposed adding a "Group I" to the contact with SEC, a
12  demand that SEC rejected.  RT 12/12, 117:2–22; Depo. of Steve Billy, 48:4–20.[1]  Local
13  12 also made a demand in 2007 to add Group I to SEC's contract, as well as a Group III,
14  or "the same contract that inspection labs that are working in the [SCCA] have."  RT
15  12/12, 121:20–21.  SEC again rejected the demand.  Id. at 121:22–23.

16          17.     In particular, Local 12 sought to add the job classification "Field Soil
17  Inspection and Soil and Material Testing," or "Field Soils and Material Tester" to the
18  CBA with SEC.  Ex. 58-3, 27–28.  Local 12 officers testified that these proposed
19  additions refer to soils and earthwork only, not to material testing in general that was
20  performed by SEL lab technicians at issue in this lawsuit.  RT12, 125:24–126:10; Billy
21  Depo. 74:17–76:13.  It is plaintiffs' contention in this lawsuit, of course, that the
22  material testing work performed by laboratory technicians was already covered by
23  SEC's CBA.  Plaintiffs note that the "Appendix B" of this proposed agreement describes
24  a category of work as "Earthwork (Soils and Material Tester)."  This proposed category
25  of work details work involving only soils and no other building materials.  Ex. 58-28.

26  _____

27          [1] The parties, by way of a stipulation, submitted excerpts of the deposition testimony
28  of Steve Billy, a former Trustee, in lieu of him testifying in person at trial.  See Ex. 706.

18.     Partridge, on the other hand, testified that this "Group I" and the Soils and Material Tester covers all of the services that are in dispute in the instant suit—"post installed anchors, drilled in anchors, proof loading, torque testing, epoxy dowels, adhesion and cohesion," and "a couple other items . . . but every single one of those items is work that is required by the building code to be done by group one employees." RT 12/14, 35:4–9; see also id. 38:1–6.  He further testified that when Local 12 first raised the issue of material testing in SEC's CBA, he subcontracted the work to a master labor agreement holder, Cignet Laboratories, who did the work in dispute with "Group I" employees.  Id. 39:7–19, 40:1–4.

19.     Billy also testified that during his entire time as a negotiator for Local 12, the parties to the negotiations never discussed the addition of adhesion/cohesion testing, torque testing, or proof load testing.  Billy Depo. 64:5–65:2, 71:13–21.[2]  According to Billy, although these types of work are not "spelled out" in the CBA, they are nevertheless covered if the type of work is "covered inspection" under the contract between SEC and the contractor or facility owner for whom SEC is performing inspection.  In other words, whatever "is required to be inspected on a project is covered work," as long as its broadly encompassed within one of the categories of work listed in the CBA.  Id. at 70:4–22.

## C.     2006 Arbitration between SEC and Local 12

20.     The parties also dispute the import of a 2006 arbitration award that resulted from a grievance Local 12 brought against SEC.  Among other findings, the arbitrator found that "offsite concrete batch inspection" is not bargaining unit work, and that "anchor bolt testing inspection work" and "water control inspection work" are bargaining work.  Ex. 12-12.

_____

[2] Billy served as Treasurer for Local 12 from 1982 until his retirement on or about April 1, 2012.  Billy Depo. 12:18–20, 26:9–18.  As Treasurer, he was responsible for negotiating contracts on behalf of Local 12.  Id. 26:19–22.

1  21.    Plaintiffs argue that because the arbitration award does not distinguish
2  between the testing of high strength anchor bolts and other types of anchor bolts, the
3  award should be read to cover all types of torque testing on all different types of bolts.
4  The Court finds that the evidence at trial does not support this contention.  As will be
5  discussed in greater detail, the testimony of a number of witnesses demonstrated that
6  pre- and post-installed anchors should be considered separately for purposes of the CBA.
7  Because the arbitration award makes no mention of these important distinctions, among
8  others, it is at best ambiguous as to the proper scope of the CBA.  Accordingly, the
9  Court finds that it should be accorded little weight, if any, in deciding what work is
10  covered by the CBA.

11  **D.    Regulatory Background**

12  22.    The Office of Statewide Health and Planning ("OSHPD") is the entity
13  responsible for overseeing the construction of various types of medical facilities
14  (including renovations to existing facilities) in the State of California.  Cal. Admin.
15  Code, Title 24, Part 1, § 7-103.[3]  Because all of the projects at issue in Parts E, F, and G
16  of the revised audit are hospital construction projects, OSHPD is responsible for
17  overseeing construction of these facilities.

18  23.     The California Division of State Architect ("DSA"), on the other hand, has
19  jurisdiction over the construction of all public school, community college, and state
20  owned or leased essential service buildings.  Cal. Admin. Code, Title 24, Part 1, § 4-202;
21  RT 12/18 156:21–25.

22  24.    Title 24 as a whole is known as the California Building Standards Code
23  ("CBSC").  See Title 24, Part 2, § 101.[4]  Part 1 of Title 24 is known as the California
24  Administrative Code or the California Building Standards Administrative Code.  See

26  [3] OSHPD is also referred to as "the Office" throughout the relevant regulations.

27  [4]All further references herein are to the 2007 edition of these California regulations.

9

Title 24, Part 1, Preface.  The California Building Code ("CBC") is set forth in Title 24, Part 2.

25.     OSHPD and DSA are responsible for enforcing the requirements of the California Building Code ("CBC") in Title 24, Part 2, in their respective fields.  The parties focused on the requirements of the 2007 version of the CBC at trial, much of which is "co-adopted" by DSA and OSHPD, along with other agencies.  RT 12/18 157:23–158:13.

26.     The CBSC distinguishes between two types of "inspectors."  First, OSHPD requires each construction project to employ a "hospital inspector of record" ("IOR"). Cal Admin. Code § 7-141(f).  The IOR is responsible for ensuring that inspection is completed in compliance with a Testing, Inspection, and Observation ("TIO") program that has been approved by OSHPD, under the direction of the architect or engineer in charge of the project.  Id. § 7-141(d), (e); id. § 7-145(a)(3); RT 12/11, 44:15–25; RT 12/14, 60:3–16, 113:2–9; Ex. 803 ("Instructions for Testing, Inspection, and Observation Program").  This requires the IOR to "maintain field records of construction progress for each day or any portion of a day that they are present at the project site location." Id. § 7-145(a)(6).  To become an IOR, an individual must submit an application to OSHPD and take an examination, which then licenses the individual in one of three classes of inspection.  Cal. Admin. Code § 7-200; RT 12/18, 14:1–15:11.

27.     The other type of inspector is a "special inspector"—the individual responsible for performing the various "special inspections" required by the CBC.  Cal. Admin. Code § 7-141(f); see also CBC § 1701A.4 9 ("the owner shall employ one or more special inspectors who shall provide inspections during construction").  The "BCIs" at issue in this litigation are all considered to be "special inspectors" within the meaning of the CBC.  "Special Inspection" is defined as the "[i]nspection . . . required [in the CBC] of the materials, installation, fabrication, erection or placement of components and connections requiring special expertise to ensure compliance with

approved construction documents and referenced standards." CBC § 1702A.1.

28.    Both OSHPD and DSA require construction inspection to be completed in conformance with Chapter 17A of the CBC, which is the primary section at issue here. This section "govern[s] the quality, workmanship and requirements" for "structural tests and special inspections." CBC § 1701A.1. This chapter requires the owner of a facility to "employ one or more special inspectors to provide inspections during construction on the types of work listed under Section 1704A. The special inspector shall be a qualified person who shall demonstrate competence, to the satisfaction of the building official, for inspection of the particular type of construction or operation requiring special inspection." Id. § 1704A.1. The categories of work covered by Chapter 17A include steel inspection, welding inspection, high-strength bolt inspection, concrete construction, masonry construction, soils inspection, and sprayed fire-resistant materials. Id. § 1704A.1–14.

29.    In addition to inspection, the CBC sets forth various tests that must be performed on building and construction materials. OSHPD requires that the "testing program" for a project "identify materials and tests to be performed on the project," as well as "the firm(s) and/or individual(s) to perform each of the required tests." Cal. Admin. Code § 7-141(e).

OSHPD further mandates that "the architect or engineer in responsible charge shall establish and administer the testing program. Where job conditions warrant, the architect or engineer may waive certain specified tests contingent upon the approval of the Office." Id. § 7-149(a). To conduct the tests, "[t]he governing board or authority of a health facility shall select a *qualified person or testing laboratory* as the testing agency. . . . The selected person or testing laboratory must be approved by the architect or engineer in responsible charge." Id. § 7-149(b) (emphasis added); see RT12/18, 34:18–21. "Qualified person or testing laboratory" is not further defined in the California regulations.

30.     DSA, on the other hand, has a special program for approving testing laboratories known as the Laboratory Evaluation and Acceptance ("LEA") program.  RT 12/18, 146:14–147:23.  Eric France, the current Administrator of the LEA program, testified at trial.  He previously was employed both as a special inspector and a technician for a laboratory testing facility in Sacramento.  RT 12/18, 148.  The DSA issues "letters of acceptance," also referred to as "licenses," to testing agencies that are approved for "the inspection of work and testing of materials" on projects under the DSA's jurisdiction.  Cal. Admin. Code § 4-335(b); RT 12/18, 149:15–23.  To obtain a letter of acceptance, a physical testing laboratory must go through a "fairly cumbersome submittal," which includes on site inspections and review of a written application.  RT 12/18, 149:24–150:10; see also id. at 57:18–62:23.  DSA issues letters of acceptance to companies that perform both inspection and testing services but does not issue acceptance letters to companies that perform only inspections; the latter lack the required physical testing laboratory.  Id. at 159:11–14, 168:17–169:4.

31.     All CBC-mandated testing work for a project falling under DSA's jurisdiction *must* be performed by an LEA-approved materials testing laboratory.  RT 12/18, 156:11–17; 159:21–160:5.[5]  An LEA-approved materials testing laboratory that also employed special inspectors could perform *both* testing and special inspections on a DSA-governed project.

32.     France testified that this testing work includes pull testing and torque testing, which must be performed by an LEA-approved materials testing laboratory on DSA-governed projects.  RT 12/18, 162:11–16.  In addition, ultrasonic testing and magnetic particle testing must be performed by qualified representatives of a testing

---

[5] For special inspections on a project under DSA's jurisdiction, a school district may contract with an LEA-approved laboratory that also performs inspections or with individual special inspectors.  There are also certain inspections, such as geothermal and technical inspections, that are not "special inspections" as that term is understood.  These types of inspections may be performed by laboratory personnel.  RT 12/18, 174:11–20.

laboratory on DSA-governed projects.  Id. at 162:17–163:17.

33.     SEL, but not SEC, is an LEA-approved laboratory.  See Ex. 802 ("Laboratories Qualifications" page from DSA website for Smith-Emery Laboratories, Inc."); RT 12/18, 57:3–18.[6]  SEL has the required physical materials testing laboratory, has gone through the extensive application and approval process, and is overseen by a civil engineer, John Latiolait.  SEL also has a number of other "licenses" that allow it to do testing work on other building projects, including licenses with the Army Corps of Engineers, the California Department of Transportation, and the City of Los Angeles.

34.     Unlike special inspectors, the laboratory technicians at SEL do not individually hold licenses or certifications in various construction inspection specialties. They instead rely on the licensing of the laboratory (for DSA-governed projects, for example) to qualify them to perform their testing work.  Laboratory technicians are also known as "materials testers."  Id.  SEL does not employ any special inspectors or "BCIs," as that term is understood by the parties, and does not do any "inspection" work. RT 12/18, 54:2–13, 55:17–66:1.

35.     According to the plain terms of the regulations at issue, and confirmed by France, the DSA requirement that all testing be performed by an LEA-approved laboratory does not apply to projects under OSHPD's jurisdiction.  RT 12/18, 165:23–166:17.  As noted, OSHPD only requires that testing be performed by a "qualified person or testing laboratory," as OSHPD has not co-adopted Title 24, Part 1, section 3-335 of the California Administrative Code.  And because the projects at issue are hospital facilities under OSHPD's jurisdiction, DSA's regulation, which requires that all testing work be performed by an LEA-approved testing laboratory, does not apply.

---

[6] France and John Latiolait, Vice President and General Manager of SEL, testified that "Masonry" should not have been checked under the "Inspection Qualifications" section of this information sheet; this indication was in error.  RT 12/18, 124:21–125:8, 166:21–168:16.

36.     However, multiple witnesses testified that SEC was required by the facility owners to contract with a DSA-licensed laboratory in order to provide testing services on the hospital projects at issue.  RT 12/14, 44:15–24; RT 12/18, 17:10–18:17, 56:6–21. For each project, SEC and the project owner entered into a contract for the provision of inspection and testing services.  SEC then subcontracted all the testing work on the project to SEL.  RT 12/14, 124:16–125:8; see Exs. 52, 534, 535 (Contracts between SEC and project owners for USC Hospital, and UCLA Santa Monica and Westwood hospitals).  SEL, in turn, billed SEC for the testing services that it performed on these projects.  Ex. 40; RT 12/18, 71:16–23.  SEC's witnesses credibly testified that these facility owners relied on SEL's DSA license in deciding that SEL was a qualified "testing laboratory" employing "qualified persons" for purposes of compliance with OSHPD's regulations.  Apparently, this is the custom and practice in the industry.[7]

37.     Michael Weiler was formerly the IOR on the UCLA Westwood replacement hospital project, from 1999 until 2002.[8]  As IOR, he was employed by the project owner, in this case the University of California Regents—not by SEL or SEC. RT 12/18, 11:16–14:1.  He testified that as the IOR for the project, he relied on SEL's

_____

[7] Plaintiffs' witness David Barton, the person in charge of inspector training for plaintiffs, testified that after tests are performed, the results must be signed off by a civil engineer, who is employed by the "testing agency" for a project.  RT 12/11, 70:23–71:10. He further testified that the testing agency must be licensed in order to oversee work such as "proof load" and "pull testing," although he did not know which agency licensed the laboratory for projects under OSHPD's jurisdiction.  Id. at 76:6–15.

[8] Although he was employed as an IOR outside the time period directly relevant to this litigation, his testimony concerns how testing was performed on this project from its inception, as required by the relevant contracts, and therefore informs the analysis here. He also served as Quality Control manager for the LA USC project from 2002 until 2008, under the employ of another company.  He credibly testified to his personal familiarity with BCIs who worked on both of these projects; his observations in the field of laboratory technicians and BCIs performing tests and inspections; and his review of laboratory and inspection reports confirming the same.  RT 12/18, 15:22–17:11, 26:4–29:22, 36:11–23.

LEA approval in determining that its employees were qualified to perform the testing work at issue.  RT 12/18, 17:18–18:20.  According to Weiler, SEL laboratory technicians were the only individuals "qualified" to perform testing work on the UCLA Westwood project, because they were the only individuals working under the employ of an approved testing laboratory.  RT 12/18, 44:12–46:2.  Moreover, Weiler testified that he would have known if other qualified individuals were performing testing on the project, because the testing reports would have come from an entity besides SEL.  Id. The only testing reports that he actually received came from SEL; "laboratory testing was not performed by Smith-Emery Company."  RT 12/18, 49:21–22.

38.    Of course, none of this evidence directly demonstrates what work is covered by the CBA.  But the fact that SEL is not a signatory to the CBA, and that SEL was the only entity approved to perform testing work on the three hospital projects, is evidence that this "testing" work is not covered by the CBA.  As will be discussed, numerous witnesses testified that only laboratory technicians performed testing work on these three projects and others—not SEC's BCIs.

While SEC would be liable to plaintiffs if the work was covered by the CBA and SEC nonetheless subcontracted the work to SEL, the regulatory background and custom and practice in the field demonstrate there is a rough dichotomy between "testing" and "inspection" work, mirroring the divide between SEC and SEL.[9]

**E.    Work of SEC's Building/Construction Inspectors**

39.    As noted, plaintiffs are claiming that contributions are owed for work that is

---

[9] If in fact SEC and SEL were the same corporate entity—an inspection and LEA-approved materials testing laboratory under one roof—then it appears that BCIs could have performed the "testing" work at issue, as BCIs are, if anything, overqualified to perform this testing work.  They have significantly more training and expertise than laboratory technicians.  Because SEC BCIs do not work for a LEA-licensed testing laboratory, however, SEC offered undisputed testimony that they could not perform testing work on the hospital projects at issue absent a variance granted by the particular project's IOR.  RT 12/14, 114:20–115:22.

styled as: (1) adhesion/cohesion inspection and fireproofing; (2) steel shop inspection; (3) torque test; (4) high strength bolt; (5) pull and proof load test; (6) epoxy dowel inspection; and (7) lab tech away.  To determine what of this work is "the work" of SEC's BCIs, the Court framed the issue at trial as: "whether any tasks performed by lab personnel have as a matter of custom and practice been treated as work done by inspectors, such that contributions are appropriate." RT 12/14, 86:1–4.  The Court discusses the relevant course of performance below.

### (1)    Adhesion/Cohesion and Fireproofing

40.    SEC's witnesses offered uncontroverted testimony that SEC BCIs are involved in some, but not all, aspects of the fireproofing process, of which adhesion/cohesion testing is one facet.

41.    Two types of fireproofing are at issue.  The first is a mixture that is sprayed on to structural steel columns, or "spray-applied fireproofing."  The BCIs' duties are to ensure that the substance is mixed properly before application; observe the substrate to which the mixture is being applied; and watch the application process and measure the thickness of the mixture as it is being applied.  The actual spraying of this mixture is done by the contractor, who is not an employee of SEL or SEC.  After observing this process, the BCI completes a daily inspection report documenting their observations. RT 12/14, 104:12–107:25.  See, e.g., Ex. 609-1.

42.    Adhesion/cohesion is a testing method that is used to verify that the spray-applied fireproofing has (1) adhered to the substrate surface (often a steel beam) and (2) that the fireproofing material itself does not pull part.  This test is performed by laboratory technicians under the employ of SEL, not BCIs, after the fireproofing material has been allowed to "cure."  RT 12/14, 106:16–107:6.  After performing the test, the laboratory technician fills out a laboratory report form.  RT 12/18, 69:10–16.

43.    SEL technicians also perform dry film thickness testing on intumescent paint.  This paint is a fireproof coating applied by the contractor to various surfaces,

16

such as handrails and stairways.  After the material has dried, the dry film thickness test is performed to test its adhesion to the substrate.  RT 12/18, 66:22–67:10.  As multiple witnesses testified, BCIs have no role to play with respect to this test either.

44.     The only witness who testified that inspectors perform the adhesion/cohesion test, David Barton, had not worked in the field for over a decade and lacked personal knowledge of SEC inspections in particular.  RT 12/11, 67:18–22. SEC's witnesses Robert Peet,[10] Travis McCall,[11] Michael Weiler, John Latiolait,[12] Ricky Morgan,[13] and Tom Huberty[14] all testified to the foregoing division of labor between

---

[10] Peet is the current Vice President of Engineering at Smith-Emery International; until 2004, he served in the same role with SEC, but his job duties have remained the same in his new role.  He worked briefly as a BCI for SEC beginning in 1997, before becoming a staff engineer later that same year.  He became a licensed civil engineer in 1999.  From 1997 to the present, he has continually observed and supervised the work of SEC BCIs on various construction projects, and credibly  testified as to their job functions.  RT 12/14, 88:4–91:23.

[11] McCall currently is the sole owner and operator of a construction inspection and management services company, which primarily provides IOR services for construction projects.  Previously, he worked as an SEL laboratory technician on the UCLA Westwood project from October 2002 until April or May of 2006.  RT 12/18, 143:1–144:24.

[12] Latiolait has been Vice President and General Manager of SEL since 2004; he started with SEL as a laboratory engineer in 2000.  RT 12/18, 51:4–54:13.  He credibly testified as to the work of SEL laboratory technicians under SEL's employ.

[13] Morgan has been employed at SEC since 1994; he became a BCI in 1996, at which time he also became a member of Local 12.  He worked on all three hospital projects at issue, and he credibly testified as to the work of laboratory technicians and BCIs on these projects.  RT 12/19, 6:19–11:1.

[14] Huberty was previously employed with SEC as a BCI from 1994 to 2003, and he has been a member of Local 12 from 1994 to the present.  He currently works as an IOR for another company.  From 2001 until 2007, he worked as both a BCI and IOR on the UCLA Westwood project.  He also credibly  testified as to the work of BCIs and laboratory technicians.

SEC's BCIs and SEL's laboratory technicians.  RT 12/14, 104:12–107:25 (Peet); RT 12/14, 150:5–151:14 (McCall); RT 12/18, 24:13–25:13 (Weiler); RT 12/18, 66:9–73:10 (Latiolait); RT 12/19, 20 (Morgan); RT 12/19, 36 (Huberty).

45.     Plaintiffs also claimed a category of work in their audit called "fireproofing," but the evidence at trial demonstrated that this category includes time spent by SEL technicians performing adhesion/cohesion and dry film thickness tests, not spray-applied fireproofing inspection.[15]  For example, plaintiffs claimed a significant amount of the time under "fireproofing" for Jerry Parcone, an employee of SEL who was performing adhesion/cohesion and dry film testing.  RT 12/18, 70:25–75:2; Exs. 40-5, 512-4–5.  Plaintiffs offered no testimony to the contrary or that goes towards proving the remainder of their claim for fireproofing.

### (2)     Steel Shop Inspection

46.     There was no dispute at trial that steel shop inspection is covered work under the CBA.  In Part E of the audit, plaintiffs claim 380.5 hours for work performed by a "Troy McLaurin" (or McLauren), for whom plaintiffs contend that SEC failed to pay contributions.  Ex. 523-4.  As discussed previously, Part E of the audit pertains to covered work that was allegedly subcontracted to "non-union subemployers" on the UCLA Westwood project.

47.     However, the evidence at trial demonstrated that Troy McLauren was employed at SEC as a BCI, before passing the OSHPD B certification exam and becoming an IOR on the UCLA Westwood project.  RT 12/14, 123:13–23.  Plaintiffs offered no evidence to the contrary.  Therefore, the Court finds that Troy McLauren is not a "non-union subemployee" as plaintiffs claim.

### (3)     Torque Test; High Strength Bolt; Pull and Proof Load Test; and Epoxy Dowel Inspection

---

[15]   Plaintiffs' auditor did not offer any testimony pertaining to this assessment for fireproofing.

48.     High strength structural steel anchor bolts:  These are large bolts made out of high strength structural steel that are used to "anchor" the building and its structure to the foundation.  After a template is cast into concrete, the contractor affixes a bolt on top of the anchor and tightens it into place.  The ironworker then uses a torque wrench to check whether the anchor bolt has been torqued to the proper foot pounds.  These bolts are also referred to as "pre-installed" anchors, as they are installed prior to placement of the concrete.  RT 12/14, 96:1–98:22.

The BCI's duties with respect to high strength structural steel anchor bolts are to verify that the material meets contract specifications; verify that it is placed in the template to be embedded with concrete to the proper depth; and verify that the bolt has been torqued to the proper foot pounds by the ironworker.  Id.  The BCI does not actually perform the torquing or torque testing of the bolt but instead observes the ironworker as he performs these tasks.  The parties do not dispute that the inspection of high strength structural steel anchor bolts is covered work.

49.     High strength structural steel bolts (non-anchor):  These high strength steel bolts are used to join beams of steel to columns of steel and are not embedded in concrete.  The BCI's duties are to ensure that the proper materials are being used and to observe the ironworker calibrating the "Skidmore Wilhelm" device with the bolt that will be used to join the steel members.  After the bolt passes inspection, the BCI will observe the process of connecting the beam and column with the bolt and ensure that the final torquing process (by the ironworker) proceeds according to specifications.  RT 12/14, 99:3–6, 99:12–104:11.  The parties do not dispute that the inspection of high strength structural steel non-anchor bolts is also covered work.  Laboratory technicians, on the other hand, have no role to play with respect to these high strength steel bolts, whether of the anchor or non-anchor variety.

50.     Post-installed drilled-in anchors:  These are bolts that are drilled into concrete after the concrete has hardened, used for connecting various other devices, but

do not provide structural support to the building.  There are numerous types of different anchors made by different manufacturers, most commonly "wedge" anchors, but all are similar in installation and operation.  For placement in hardened concrete, the contractor first drills a hole to the correct depth.  The BCI verifies the depth of the hole, its diameter, that the hole is clean post-drilling, and reports his findings in an inspection report.  RT 12/14, 108:1–112:1.

51.     Post-installed drilled-in epoxy dowels:  These are similar in function to post-installed anchors but involve the use of rebar or a threaded rod in place of an anchor.  The BCI's duties are largely the same with respect to these dowels, with the additional responsibility of verifying that the rebar has been inserted at the correct depth into the epoxy.  RT 12/14, 116:18–119:9.

52.     Multiple witnesses also testified to the role that SEL laboratory technicians play with respect to these post-installed anchors or epoxy dowels.  In particular, SEL technicians performed torque testing on the post-installed drilled-in wedge anchors using a calibrated torque wrench, to ensure that the nut on the anchor has been "snapped" to the correct torque.  RT 12/14, 111:23–112:9; 146:6–21.  Except on rare occasions, BCIs did not perform these tests.

53.     Laboratory technicians also performed pull or proof load testing, which multiple witnesses testified are essentially synonymous terms.  RT 12/14, 148:13–16.  These tests are performed on "drop-in" post-installed anchors using a hydraulic ram or hydrometer, in order to ensure that the proper tension has been achieved with the anchor.  RT 12/18, 19:1–17.  As with torque testing of these post-installed anchors, BCIs did not perform proof or pull tests on hospital projects at issue.  RT 12/18, 21:17–22:8, 22:22–24:12.  BCIs will often, but not always, observe these tests being performed.

54.     Based on the evidence at trial, the Court finds that all of these tests performed on post-installed anchors have not, as a matter of custom and practice, been the work of SEC's BCIs.  As with the adhesion/cohesion work discussed previously,

multiple witnesses testified that SEC BCIs have never been involved in performing these tests, either before or after the formal separation of SEC from SEL.  RT 12/18, 18:21–24:12, 36:11–23, 75:8–77:15; RT 12/19, 11:9–18:10; RT 12/14, 106:24–107:6, 146:6–147:2, 148:13–150:4; 152:10–22; RT 12/19, 35:1–36:4.

A number of plaintiffs' witnesses also support this finding.  For example, Frank Valenti, the current business representative at Local 12 and a former special inspector for SEC from 1988 until 1999, testified that he never performed proof load tests during his time as a special inspector, and that he performed a pull test once in his eleven years on the job.  RT 12/12, 109:8–112:2.[16]  Jason Lampley, a former SEL laboratory technician testifying on behalf of plaintiffs, confirmed that all of the work he performed was in the "post-installation phase"—torque tests, pull tests, and proof load tests—and that the overwhelming majority of the time, inspectors did not "assist" technicians with these tests.  RT 12/11, 101:12–102:15, 111:7–23.  As noted previously, the inspection tasks related to pre- and post-installed anchors and epoxy dowels are covered work, as there is no dispute that this is the work of a BCI.[17]

55.    Plaintiffs also assert a claim for $572.40 for "high strength bolt" inspection work that was performed by Ronald Lai.  The testimony at trial, however, revealed that Lai is not an employee of SEC or SEL, but was retained by SEL to perform special inspection work on an SEL-project unrelated to any of the hospital projects at issue.  RT

---

[16] Valenti testified that he performed torque tests on post-installed anchors between "one and a million" times per year during his tenure as an SEC BCI.  RT 12/12, 103:18–104:13, 107:3–11.  He admitted it had been "a long time" since he had performed any tests or inspections for SEC.  As no other witnesses corroborated this testimony, other than the non-credible testimony offered by Lorne Leufven, the Court finds that the evidence supports SEC's contention that this testing is not the work of an SEC BCI.

[17] BCIs would, on rare occasion, perform these tests at the request of the IOR for a project, who had the authority to have BCIs perform these test as "a matter of convenience."  RT 12/14, 113:2–115:22.  These sporadic tests performed by BCIs does not transform this testing work into "the work" of SEC BCIs.

12/18, 82:16–86:10.  This work was erroneously billed to the UCLA Santa Monica Hospital project and therefore was incorrectly included in the audit.

56.    Plaintiffs claim $122.80 is owed for "epoxy dowel inspection" in their revised audit.  Ex. 523-1, 23.  Although this category of work is covered under the CBA, plaintiffs offered no evidence as to what work this individual was actually doing—i.e., whether he was in fact performing testing or inspection related to epoxy dowels.  The auditor testified that he claimed all such work, whether testing or inspection.  According to plaintiffs' audit, this particular individual performed the tests identified herein, such as torque testing, on several other occasions.  See Ex. 523.

### (4)    Lab Tech Away

57.    The designation "lab tech away" does not pertain to one particular type of inspection or testing work but is a generic term used on SEL billing invoices to refer to any time spent by a technician "outside of the laboratory on a job site performing some activity."  RT 12/18, 80:2–8.  Plaintiffs' auditor testified that he attempted to confirm what work was actually being performed by cross-referencing time tickets or the testing report when these documents were available.  RT 12/12, 149:9–17; 12/13(am) 73:7–13.

However, SEC did not produce time-tickets or other records for much of the "lab tech away" work.  From the available documentation, plaintiffs' auditor concluded that much, if not all, of the work billed as "lab tech away" pertained to torque testing, pull testing, adhesion/cohesion testing, and proof load testing.  RT 12/13(am), 49:20–54:15.  Plaintiffs did not demonstrate that the lab tech away designation corresponded to any types of work other than this testing work.

58.    Plaintiffs' auditor was also unsure as to whether, after removing a number of categories of work from plaintiffs' claim, any of these categories of work were still included within their claim for "lab tech away" work.  RT 12/13(am), 54:16–57:9.

### F.    Travel Time

59.    Part B of plaintiffs' audit seeks contributions for "travel hours," primarily

for time spent traveling by a Ricky Morgan, an SEC BCI.

60.     At trial, SEC contended that a 2003 Settlement Agreement, related to a
previous suit brought by the Trustees, bars plaintiffs' claim in this litigation.  This
agreement provides in relevant part:

> As third party beneficiaries to the Local 12 Agreement, Smith-Emery
> recognizes that the Trustees do not have the ability to negotiate the terms of
> the Local 12 Agreement between Local 12 and Smith-Emery.
> Nonetheless[,] the Trustees promise to refrain from making a claim for
> fringe benefit contributions for travel time . . . after March 1, 2003, up until
> June 30, 2004, or the time Smith-Emery negotiates its next Collective
> Bargaining Agreement with Local 12 to resolve the issue of 'travel time.'

Ex. 684-8.

61.     In SEC's view, the evidence at trial demonstrated that the issue of the
proper scope of covered "travel time" under the CBA was never subsequently negotiated
or resolved, and therefore, any assessment for travel time in this litigation would be
inappropriate.   See RT 12/13, 103:5–23.

62.     Plaintiffs contend that the issue of travel time was in fact negotiated by
Local 12 and SEC, as demonstrated by SEC's own evidence.  Plaintiffs point to the letter
from Gregory Wolflick to James Partridge, noting that SEC had "agreed to modifications
for the travel and mileage portions of the contract[,] which provides that the employee's
workday begins when he/she leaves the employer . . . ," as well as a proposal Local 12
sent to SEC that introduces potential modifications to the travel time provisions of the
CBA.  See Ex. 58-15; Ex. 59.

63.     The Court finds that Local 12 and SEC did not "resolve" the issue of
whether contributions are owed for travel time in adopting either of the subsequent
CBAs, and accordingly, no contributions are owed to plaintiffs pursuant to the parties'
2003 settlement agreement.  While the evidence in the record supports a finding that

Local 12 and SEC negotiated over minor amendments to the "Travel, Mileage, and Subsistence" section of the CBA, set forth in Article XII, these parties did not negotiate or resolve the issue of whether contributions are owed for travel time by otherwise covered employees.  Without any resolution of this issue, plaintiffs' claim for contributions based upon travel time in this litigation is improper under the 2003 settlement agreement.  Accordingly, the Court finds that no contributions are owed for Part B of plaintiffs' audit.

### G.   Cash Disbursements

64.   Plaintiffs seek contributions in Parts I and K for cash disbursements allegedly made by SEC to several non-union companies for covered work under the CBA.  Plaintiffs' auditor only claimed work that he determined was performed within Local 12's geographic jurisdiction, to the extent that this information was available to him.  RT 12/13(am), 67:22–24.

65.   DC Inspections:  SEC does not dispute that contributions are owed for work performed by subemployer DC Inspections on a project for the Bakersfield Hospital.  See Ex. 504.  Accordingly, the Court finds that plaintiffs have properly claimed contributions for this subcontracted work.

66.   Forest Products:  Plaintiffs contend that contributions are owed for inspection work performed by Forest Products Inspection, Inc.  Plaintiffs' auditor testified that he claimed this work based on the documents available to him, which indicated that at least part of the work was performed within Local 12's jurisdiction.  RT 12, 153:12–155:13.  Defendant offered no testimony of its own as to where the work was performed, but it challenges the sufficiency of plaintiffs' showing.

The Court finds that at least some of the contributions claimed by plaintiffs are for work that Forest Products performed within Local 12's jurisdiction; therefore, plaintiffs may properly claim an entitlement to contributions for this work.  The "Certificate of Continuous Inspection of Truss-Joint Members" provides that the inspection work

relates to structural members manufactured by a company in Chino, California, for the "Central Los Angeles Learning Center" project.  Ex. 500-1, 3.  These locations are all within the geographic coverage of the CBA.  Moreover, although Forest Products itself is located outside of Local 12's jurisdiction, the invoices indicate that its inspectors incurred significant "Inspection Mileage" in performing their duties.  Ex. 500-3.  Accordingly, the Court finds that plaintiffs have made a sufficient showing that at least some of this covered work took place within Local 12's jurisdiction.  Contributions are appropriate.

67.     ES Engineering and CSI Services, Inc.:  According to the invoices admitted into evidence, plaintiffs' claims related to ES Engineering and CSI Services pertain to work performed for Smith-Emery Company, San Francisco.  Exs. 503, 506.  However, SEC's records demonstrate that it—not SEC SF—paid the invoices related to these two inspection companies.  See id.  These records further demonstrate that the companies who performed this "special inspection" and "steel shop inspection" work were located within Local 12's jurisdiction.  In fact, ES Engineering performed some of the work at "Robinson Manufacturing" in Placentia, California.  Ex. 506-8.  SEC offered no evidence to the contrary.

68.     AP Inspections and Advanced Inspection:  At trial, plaintiffs' auditor testified that he made a claim for work subcontracted to Advanced Inspection because the company is called "Advanced Inspections" and located in Santa Clarita, California, which lies within Local 12's jurisdiction.  RT 12/12, 155:14–156:11; Ex. 501.  AP Inspections is also located within Local 12's jurisdiction.  Ex. 502.  Neither party offered additional evidence as to where the work was performed or what work Advanced Inspections or AP Inspections was performing for SEC.

## III.   CONCLUSIONS OF LAW

69.     To the extent necessary, each of these conclusions of law may be deemed a finding of fact.

**A.      ERISA**

70.      Section 15 of ERISA, 29 U.S.C. § 1145, provides that "[e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collective bargaining agreement shall . . . make such contributions."  Plaintiffs, as Trustees for the various trust funds, are authorized to bring a civil enforcement action to enforce this provision.  29 U.S.C. § 1132(a)(3).

**B.      Legal Standard for Interpreting a CBA**

71.      Federal common law governs the interpretation of the CBAs at issue in this litigation; these agreements, in turn, determine when contributions are owed to plaintiffs under ERISA.  In general, "[a] collective bargaining agreement is governed by the detailed provisions of the Labor Management Relations Act, 29 U.S.C. §§ 141–187, and ERISA.  It is not 'governed by the same old common-law concepts which control . . . private contracts.'"  Nw. Administrators, Inc. v. B.V. & B.R., Inc., 813 F.2d 223, 226 (9th Cir. 1987) (quoting Transportation- Communication Employees Union v. Union Pacific R.R., 385 U.S. 157, 160–61 (1966)).

72.      As with all contracts, "[t]o ascertain the meaning of [a] collective bargaining agreement, [the Court must] first examine its express written terms."  Nw. Administrators, 813 F.2d at 225.  Where these terms are ambiguous or the agreement's scope is unclear, "the court must determine the 'parties' actual intent' at the time of the agreement's execution."  Id. (quoting Kemmis v. McGoldrick, 767 F.2d 594, 597 (9th Cir. 1985)).  In these circumstances, appeal to extrinsic evidence is appropriate.  This includes evidence of the bargaining history, custom in the industry, and conduct of the parties, with the latter to be given "great weight" in determining the parties' intentions.  Kemmis, 767 F.2d at 597; see also Pierce County Hotel Employees & Restaurant Employees Health Trust v. Elks Lodge, 827 F.2d 1324, 1327 (9th Cir. 1987) (where a term is ambiguous, relevant extrinsic evidence may include "earlier negotiations, later conduct, related agreements, and industrywide custom").

**C.      Travel Time and Part B of the Revised Audit**

73.      Based on the Court's findings of fact above, the Court concludes that no contributions are owed to plaintiffs for Part B of the audit pertaining to travel time.

**D.      Plaintiffs' Claims under Parts E, F, and G of the Revised Audit**

**(1)      The CBAs**

74.      As set forth in detail in the Court's MSJ Order, the work that is covered under the parties' agreement is broadly defined as "all field work inspection by licensed or registered Building/Construction Inspectors of concrete, steel, masonry work and non-destructive and/or grading inspection" within Local 12's jurisdiction.  MSJ Order at 16 (citing Ex. 1 at 2).  The Court further concluded that this "Coverage Definition" is not limited to work required to be performed by a licensed BCI, nor is it limited to only "inspection" versus "testing" work.  Id. at 16–17.

75.      Appendix B of the CBA provides "general descriptions of inspection and testing work covered by this Agreement."  Ex. 2-26.  The preface to this appendix states that "any similar duties performed by employees in the classifications covered by this Agreement, or other tasks pertaining to the completion of the work described hereinbelow, shall be covered by this Agreement even if not set forth in this Agreement."  Id.  The phrase "employees in the classifications covered by this agreement" refers to SEC's BCIs, and the work of these BCIs.

76.      While some types of work are unambiguously covered by the CBA, including Appendix B thereto, the CBA is ambiguous as to whether other types of work at issue in this litigation are covered.  Accordingly, resort to extrinsic evidence is necessary and appropriate as described herein.

77.      The crucial question is determining what work, as a matter of custom and practice, has been performed by a licensed or registered Building/Construction Inspector ("BCI") employed by SEC.  SEC owes contributions to the trust funds for the performance of this covered work, whether or not the work was performed by SEC

1    BCIs.

2                    **(2)    Relevant Extrinsic Evidence**

3         78.    Based on the foregoing findings of fact, the Court concludes that the

4    following extrinsic evidence the parties offered at trial that bears on the interpretation of

5    the CBAs at issue, and the Court's consideration of this evidence is reflected in these

6    findings of fact and conclusions of law.  The Court gives "great weight" to the parties'

7    actual conduct and practice under the CBAs, which is discussed at length in the findings

8    of fact above.  Additional bodies of extrinsic evidence are discussed below.

9         79.    NLRB Certification:  Plaintiffs argue that this certification of a bargaining

10   unit is meant to include all employees performing testing and inspection field work, and

11   exclude all those employees who were not, such as laboratory employees who remained

12   in the laboratory.  Defendant maintains that this certification in fact only includes the

13   employees who performed "field inspection" work, and therefore any "laboratory"

14   technicians are necessarily excluded.

15        While the Court agrees with defendant that the certification clearly excludes

16   laboratory employees from its coverage, the certification does not define what the work

17   of "field inspectors in [SEC's] Los Angeles Physical Testing Department" is, beyond the

18   broad categories listed in the order (concrete, structural steel, and masonry inspection).

19   Since no further testimony was offered as to the meaning of the certification order, the

20   Court cannot definitively determine from the plain language alone whether this

21   limitation to "field inspection" excludes the type of work at issue in this case.  However,

22   the limitation to "field inspection," particularly in light of the other extrinsic evidence

23   presented in this case as to what tasks BCIs customarily have performed, weighs in favor

24   of defendant's interpretation of the CBA to exclude testing work by laboratory

25   personnel.

26        80.    Bargaining history:  There was not a meeting of the minds between

27   defendant and Local 12 with respect to the "Field Soils and Material Tester" ("FSMT")

28
                                              28

designation that Local 12 sought to add to the CBA in 2004 and again in 2007.  Local 12 contends that materials testing was already covered in the CBA, and that the addition of Field Soils and Material Testers would only add duties related to the inspection of soils, and not other building materials.  SEC argues that Local 12 was attempting to add coverage for "materials testing" by proposing the addition of Group I work, akin to the coverage of the MLA.  At trial, witnesses for SEC and plaintiffs offered conflicting testimony as to whether Local 12's proposed addition would have increased the coverage of the CBA to cover all types of materials testing, not simply the testing related to soils.

81.     Given this conflicting testimony, the Court finds that there was no meeting of the minds on the meaning of Local 12's proposed increase in coverage; therefore, the bargaining history is only partially informative as to the proper meaning of the CBA.  SEC firmly believed that the operative CBA at the time of the 2004 negotiations did not cover materials testing of the type for which plaintiffs seek contributions in this lawsuit.  Local 12, on the other hand, sought to add FSMT work to the CBA under the belief that other materials testing work at issue—such as adhesion/cohesion, pull testing, and torque testing—was already covered by the terms of the CBA.  Once SEC rejected Local 12's offer, SEC continued to assert that the work at issue was not covered by the CBA, and Local 12 continued to assert that the work was covered.  The bargaining history in this respect does not shed light on the proper interpretation of the CBA.

82.     However, the fact that Billy does not recall even discussing adhesion/cohesion testing, torque testing, or proof load testing during his many years as a participant in negotiations, coupled with the fact that SEC offered credible testimony that BCIs have never performed such work as a matter of custom and practice, lends support to SEC's preferred interpretation of the CBA.[18]

_____

[18] As part of finalizing the 2004–2007 CBA, Billy, as Local 12's representative, agreed that the this new CBA would "not in any way expand the scope of the Agreement (continued...)

83.    DSA Requirements for Laboratory Approval:  Plaintiffs move to strike all testimony with respect to what testing work DSA requires to be performed by an LEA-licensed laboratory.  The Court denies plaintiffs' motion to strike.[19]  As noted, the Court finds that SEC demonstrated that it relied on SEL's license in obtaining and performing the work at issue.  Therefore, although these hospital projects are under OSHPD's jurisdiction, evidence with respect to DSA's regulatory regime for inspection and testing is relevant and admissible.  However, that this evidence is relevant does not mean that it is entitled to significant weight in interpreting the CBA, which must be done in light of the record as a whole.

84.    Plaintiffs offered evidence that SEC and SEL employees both use the same "Smith-Emery Field Time Tickets," which do not distinguish between SEC BCIs and SEL laboratory technicians.  Both SEC and SEL employees signed on the "Inspector Signature" line on the time ticket, which further reference the minimum charges "per Union Contract."  Ex. 22-4.  These time cards were often submitted to LA County USC and UCLA as "backup" for SEC's (and SEL's) billing invoices.  RT 12/18, 140:8–142:15.  While using these time tickets for SEL employees may be deceptive, it does not inform what the work of a BCI is.

### (3)    Adhesion/Cohesion and Fireproofing

85.    Appendix B of the CBA provides that the spray-applied fireproofing inspector shall "check the condition of the substrate"; "check all materials used for

_____

[18](...continued)
to include any additional work or job classifications beyond the scope of the parties collective bargaining agreement which expired July 31, 2004."  Ex. 7.

[19] Plaintiffs move to strike testimony related to DSA's requirements for LEA-approved laboratories primarily on relevance grounds, a ground that plaintiffs raised at trial and the Court provisionally overruled subject to a motion to strike.  Plaintiffs further objections on hearsay and other grounds are either raised for the first time in their post-trial evidentiary brief, or were conclusively, not provisionally, overruled at trial.  See, e.g., RT 12/18, 56:22–23.  These latter objections are improper.

conformance to approved plans"; verify the certification of the "nozzleman"; "monitor the thickness of the . . . material during installation"; and "check and record the thickness of the fire restrictive material . . . and perform sampling as required by job specifications and the UBC and/or IBC."  Exs. 1-38; 2-40.

86.    In light of the testimony at trial with respect to the duties of a BCI, the Court finds that "the work" of the spray-applied fireproofing BCI, as set forth in the CBA, does not include adhesion/cohesion or dry film testing work.  Appendix B's references to "sampling," "other duties," or "similar tasks" do not support plaintiffs' contention that testing work related to fireproofing is covered work, in the absence of any credible testimony or other evidence that the CBA was intended to cover adhesion/cohesion and related testing work.

87.    In addition, plaintiffs rest their claim on the fact that the ICC Spray-Applied Fireproofing Inspector examination includes questions regarding intumescent paint and adhesion/cohesion testing.  RT 12/11, 66:4–24.  While this evidence supports their contention that SEC BCIs may be informed about these tests, plaintiffs failed to offer any credible evidence that SEC BCIs perform these tests as part of their inspection duties.

88.    Therefore, the Court concludes that the entire assessment by plaintiffs' auditor in parts E, F, and G of the audit for "adhesion-cohesion inspection" was in error. This is testing, not inspection work, and does not fall within the customary duties of an SEC BCI and is not covered by the CBA.

89.    The Court also finds that plaintiffs failed to prove that their claim for "fireproofing" pertains to anything other than the testing work that is not covered by the CBA.  Accordingly, the Court concludes that the entire assessment by plaintiffs' auditor in parts E, F, and G of the audit for "fireproofing" is also in error.

**(4)    Steel Shop Inspection**

90.    Because the Court finds that Troy McLauren is not a "non-union

subemployee" as plaintiffs contend, plaintiffs' claim for contributions related to steel shop inspection work must fail.[20]

### (5)   Torque Test; High Strength Bolt; Pull and Proof Load Test; and Epoxy Dowel Inspection

91.   Plaintiffs contend that torque testing, high strength steel bolt inspection, pull and proof load testing, and epoxy dowel inspection are covered according to various sections of the CBA.  Of these types of work, only high strength bolt inspection is expressly called out in the CBA, including Appendix B.[21]  In plaintiffs' view, the duties of the reinforcing steel, structural steel, and concrete inspector, as set forth in Appendix B, contemplate that the work of SEC BCIs includes all of this testing and inspection work.

92.   The "reinforcing steel" inspector is first tasked with reviewing the applicable building codes, verifying steel mill reports, sampling material for tests, checking each shipment of reinforcing steel for quality.  Next, during "placement of reinforcing" steel, the inspector must make various observations, including checking that the reinforcing steel and "embedded items, including anchorages, inserts and bolts," remain "solidly cast in place during placement of concrete."  Afterwards, the inspector must submit a written progress report addressing his or her observations. Exs. 1-24, 25; 2-26, 27.

93.   The duties of the "structural steel and welding inspector" extend to both the "shop and field" according to the CBA.  Duties include reviewing the applicable building code; reviewing steel mill reports; coordinating "sampling and testing" for the laboratory; "welding observation," including observation and inspection of welding

---

[20] To the extent that plaintiffs contend that evidence not admitted at trial undermines this conclusion, the Court finds plaintiffs' argument unavailing.  See Pls.' Opp'n to Def.'s Mot. to Strike at 7.

[21] Appendix B is identical for the 2001, 2004, and 2007 CBAs.

process; checking the "workmanship" after manipulations of steel are completed; and ensuring that welding is done in proper sequence.  These duties also include observation of the "high strength bolting" process, which entails sampling high strength bolts for testing, reviewing the compliance of bolts with project specifications, reviewing the installation procedures, verifying installation of the bolts, and checking calibration of wrenches used for tightening of these bolts.  The inspector must then submit written reports detailing the foregoing.  Exs.1-29, 30, 31; 2-31, 32, 33.

94.     The "concrete" inspector is tasked with reviewing the approved plans and specifications for the concrete; checking for cleanliness and proper treatment prior to placement of the concrete; and "observing placement procedures for evidence of segregation, possible cold joins, displacement of reinforcing forms and proper support of embedded items, anchor bolts, etc."  Thereafter, the inspector is responsible for "sampling and testing" fresh concrete for conformance with specifications and submitting a written report documenting the "tests and observations" the inspector made. Exs. 1-40, 41; 2-42, 43.

95.     Based on the plain text of the CBA, the parties agree that the *inspection* of epoxy dowels and high strength bolts is covered work.  The former is referenced, in part, in Appendix B's description of the BCI's duties to "check" and "verify" that the "embedded items" are "solidly" placed in concrete.  The latter is referenced in Appendix B, within the structural steel and welding inspector section.

96.     As the Court found above, however, plaintiffs have not demonstrated that contributions are owed for any high strength bolt inspection work that was performed. The high strength bolt inspection work performed by Ronald Lai was subcontracted by SEL, an entity that is not a signatory to the CBA with Local 12.  Contributions are not owed for work sublet solely by SEL, as this work arose out of an inspection contract to which SEC was not a party.

97.     In addition, plaintiffs have failed to prove their claim for epoxy dowel

inspection.  Plaintiffs offered no evidence as to whether this individual was performing testing or inspection related to the installation of epoxy dowels, as plaintiffs' auditor claimed all such work.  Because this individual also performed torque testing and other such tests, the Court concludes that he was most likely an SEL employee performing testing related to epoxy dowels, and that therefore, no contributions are owed.

98.     Although sections of Appendix B briefly note that the "checking" of embedded items is part of the duties of the BCI, the CBA does not otherwise mention proof load testing, pull testing, or torque testing work, at least by name.  Moreover, all of the references to the checking and verifying of embedded items relate to checking these items during the placement of concrete and "observ[ing]" the proper support of embedded items.  See, e.g., Ex. 1-41.  As to torque testing, the CBA does contemplate that inspectors will be responsible for "check[ing] calibration of wrenches for tightening capacity" for high strength bolting, but does not dictate that inspectors are responsible for operating these wrenches with respect to high strength bolts or any other type of bolt.  This tracks the evidence at trial of how BCIs actually work in the field with respect to high strength bolts.

While perhaps this language, and the CBA taken as a whole, could be read broadly to cover the testing work for which plaintiffs seek contributions in this lawsuit, the clear weight of the evidence at trial, based on the SEC and Local 12's actual practice, bargaining history, and the other extrinsic evidence noted above, supports SEC's contention that proof load, pull, and torque testing are not covered by this or any other section of the CBA.  The failure to specify these testing duties in the CBA was reflected in the actual practice in the field, and plaintiffs have failed to prove that this testing work is otherwise covered under the CBA's "catch all" provisions, such as the ambiguous references in Appendix B extending coverage to "similar duties" or "other tasks" related to the work expressly covered by the CBA.

99.     Accordingly, the Court concludes that plaintiffs' claim for damages related

to torque testing, proof load testing, and pull testing all must fail.  Local 12 and SEC did not mutually agree to cover this work under the CBAs.[22]

100.   To the extent that the Court concluded otherwise in adjudicating the parties' cross-motions for summary judgment, the Court finds it appropriate to reconsider this conclusion here based on the clear weight of the evidence adduced at trial.

### (6)   Lab Tech Away

101.   Because the Court finds that torque testing, pull testing, adhesion/cohesion, and proof load testing are not work covered by the CBA, plaintiffs' claim for damages related to the "lab tech away" designation must fail as well.  Plaintiffs did not demonstrate that lab tech away work corresponded to any work of a BCI that is covered by the CBA.

102.   Based on the foregoing discussion, the Court concludes that plaintiffs are not entitled to any damages on Parts E, F, and G of their revised audit.  Plaintiffs did not demonstrate that contributions are owed for any of the work claimed in these parts of the audit, even where the type of work is otherwise covered by the CBA.

103.   Because plaintiffs have not demonstrated that defendant failed to report contributions for any of the hours claimed in this section, plaintiffs are not entitled to avail themselves of the "burden-shifting" rule set forth in Brick Masons Pension Trust v. Industrial Fence & Supply, Inc., 839 F.2d 1333 (9th Cir. 1988), as discussed in further detail below.  There has been no showing that any employee named as a non-union

---

[22] Plaintiffs' auditor confirmed that he does not know whether the work claimed as "torque testing" refers only to work pertaining to post-installed anchors, or whether this also includes torquing of high strength steel bolts.  RT 12/13(am), 59:4–14.  In fact, plaintiffs' auditor testified that the vast majority of the employers whom he has audited in the past are signatories to the Master Labor Agreement, not "independent" contracts like SEC's.  RT 12/13(am), 22:15–23:22.  Moreover, he admitted that Local 12 officials told him that he should read the SEC CBA to "mirror" the Master Labor Agreement or Master Inspection Agreement, and that he in fact conducted the audit according to these instructions.  RT 12/13(am), 24:6–27:20.

subemployee of SEL in Parts E, F, and G of the audit performed work that is covered under the CBA.

### E.   Plaintiffs' Claims under Parts I and K of the Revised Audit

104.   As noted, the Court finds that plaintiffs are entitled to damages for inspection work subcontracted to DC Inspections and Forest Products, two non-union subcontractors, in the amounts of $48,768.40 and $28,898.05, respectively, as claimed in plaintiffs' audit.

105.   For the remaining work claimed in Parts I and K, plaintiffs invoke the Ninth Circuit's "burden-shifting" rule set forth in Brick Masons.  Under Brick Masons, "once the Trust Funds prove[] the fact of damage and [the defendant's] failure to keep adequate records, the burden shift[s] to [the defendant] to come forward with evidence of the extent of covered work performed by the . . . employees [at issue]."  839 F.2d at 1338–39.  The Ninth Circuit subsequently clarified the parameters of this test, holding that "once the Trustees show (1) that [defendant] failed to keep adequate records, and (2) that there exist some employees who (a) performed covered work that was (b) unreported to the trust funds, then the burden shifts to [defendant] to show the extent of the unreported covered work for those employees."  Motion Picture Indus. Pension & Health Plans v. N.T. Audio Visual Supply, Inc., 259 F.3d 1063, 1066 (9th Cir. 2001).

In other words, "once the Trust Funds prove[] the fact of damage and the employer's failure to keep adequate records, the burden shift[s] to the employer to come forward with evidence of the extent of the damage."  Id. at 1065 (quotation omitted); see also Cent. Pension Fund of Int'l Union of Operating Engineers & Participating Employers v. Ray Haluch Gravel Co., 695 F.3d 1, 9 (1st Cir. 2012) cert. granted on other grounds, No. 12-992 (U.S. June 17, 2013) ("burden-shifting occurs only when a fiduciary seeking remittance of unpaid benefit contributions shows both that some employees performed covered work that was not reported to the benefit plan and that the employer neglected to maintain adequate records"); Brick Masons, 839 F.2d at 1338

36

("An employer cannot escape liability for his failure to pay his employees the wages and benefits due to them under the law by hiding behind his failure to keep records as statutorily required.").

106.   At trial, defendant did not dispute the Court's finding in its MSJ Order that defendant did not maintain adequate records for the entire time period at issue.  This satisfies the first part of the N.T. Audio or Brick Masons test.  See 29 U.S.C. § 1059(a)(1).

107.   Given that SEC failed to pay contributions to plaintiffs based upon cash disbursements to nonunion subemployers, plaintiffs contend that they can properly invoke the burden-shifting rule of Brick Masons for the remainder of the work claimed in Parts I and K, placing the burden on defendant to prove that these cash disbursements do not correspond to covered work under the CBA.  Defendant, on the other hand, submits that the proper interpretation of Brick Masons is that plaintiffs must prove the fact of damage as to each subemployer in Parts I and K to invoke the burden shifting rule.  In its view, demonstrating that defendant owes at least some contributions for one subemployer does not entitle plaintiffs to invoke Brick Masons for all the other subemployers claimed in Parts I and K.

108.   Applying these principles, the Court concludes that plaintiffs are entitled to contributions for the remainder of the subcontracted work claimed in Parts I and K of their audit.  Plaintiffs have proven that SEC has sublet covered work, performed within Local 12's jurisdiction, on more than one occasion.  Moreover, the balance of the work at issue in Parts I and K was sublet to inspection companies located within Local 12's jurisdiction, which performed tasks such as "special inspection" and "steel shop" inspection.  And least some of this sublet inspection work was actually performed by these subcontractors within Local 12's jurisdiction.

109.   The foregoing is circumstantial evidence that SEC subcontracted covered inspection work that plaintiffs have claimed in Parts I and K of their audit, sufficient to

prove the "fact" of damage.  Defendant, however, remained silent in the face of plaintiffs' showing, offering no evidence that the work in question was performed outside of Local 12's jurisdiction or was not otherwise covered by the CBA.  If defendant had evidence that some or all of this work was not performed in Southern California, for example, defendant could have easily presented such evidence at trial.  Defendant did not do so.  Accordingly, the Court concludes that plaintiffs are entitled to contributions for all of the remaining work in Parts I and K, as SEC has not otherwise "come forward with [its own]" evidence of the extent of the damage."  N.T. Audio, 259 F.3d at 1065.

110.   Finally, defendant's contention that contributions are not owed for work performed for Smith-Emery Company, San Francisco is without merit here, because the evidence demonstrates that SEC paid for all of the work in question.  Since SEC is the one who paid for the work in question, it matters not for whom the work was performed—it is as if SEC sublet the covered work itself and paid the subcontractor.  Indeed, defendant's argument is belied by its admission of liability with respect to the work sublet to DC Inspections.  The relevant invoices indicate that DC Inspections performed this work for Smith-Emery Company, San Francisco, CA.  See, e.g. Ex. 504-12.

### F.    Admissibility of Plaintiffs' Audit

111.   SEC also moves to strike exhibits 107–109, 523, 525, and 533, which taken as a whole comprise plaintiffs' revised audit.  The Court concludes that plaintiffs' audit, as the Court found once before, is admissible evidence.

112.   Under Federal Rule of Evidence 1006,

[t]he proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court.  The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at

a reasonable time and place.  And the court may order the proponent to produce them in court.

To be admissible under this rule, "[a] proponent of summary evidence must establish that the underlying materials upon which the summary is based (1) are admissible in evidence and (2) were made available to the opposing party for inspection." United States v. Rizik, 660 F.3d 1125, 1130 (9th Cir. 2011).  Both of these requirements are satisfied here.

First, all of the underlying materials are business records of either SEC or public entities for which SEC performed the work in question.  Under Federal Rule of Evidence 803(6), these records all qualify as records of a regularly conducted activity.  Second, plaintiffs made all of these records available to SEC for inspection, to the extent that SEC did not itself already have these documents in its possession.

113.   Contrary to SEC's argument, there is no requirement that plaintiffs "identify" every document which directly led plaintiffs' auditor to assert claims for contributions in the revised audit.  Plaintiffs identified all of the documents that their auditor relied on in developing the audit, supplied to defendant the auditor's original notes used in creating the audit and the revised audit (exhibits 107–109,525, and 533) and have summarized the resulting damages calculations in Exhibit 523, after removing claims for work that took place four years before the initiation of this lawsuit.  Defendant's remaining contentions for excluding these exhibits are similarly unpersuasive.  It is irrelevant what sources the auditor relied on in deciding whether to claim certain *types* of work, where the hours spent performing these job tasks is reflected in the underlying business records.  Accordingly, the Court denies defendant's motion to strike.

### G.   Damages

114.   Section 1132(g) sets forth the damages that plaintiffs are entitled to on their successful claims for contributions.  In particular, the Court must award the plan:

(A) the unpaid contributions,

(B) interest on the unpaid contributions,

(C) an amount equal to the greater of–

(I) interest on the unpaid contributions, or

(ii) liquidated damages provided for under the plan in an amount not in

excess of 20 percent (or such higher percentage as may be permitted under

Federal or State law) of the amount determined by the court under

subparagraph (A), [and]

(D) reasonable attorney's fees and costs of the action[.]

Id. § 1132(g)(2). This section is "mandatory and not discretionary," where "(1) the employer [is] delinquent at the time the action is filed; [and] (2) the district court [enters] a judgment against the employer." Nw. Adm'rs, Inc. v. Albertson's, Inc., 104 F.3d 253, 257 (9th Cir. 1996) (citation omitted).

115. Here, the Court finds that plaintiffs are entitled to the following unpaid contributions for Part A of the audit pertaining to Clerical Errors and Parts I and K for Non-Union Subemployer Cash Disbursements, per Exhibit 523:

|  |  | **Amount** |
|---|---|---|
| **Part A** | Clerical Errors | $   5,335.54 |
|  |  |  |
| **Parts I/K** | Forest Products | $  28,898.05 |
|  | Advanced Inspection | $      862.05 |
|  | AP Inspection | $  27,951.60 |
|  | ES Engineering | $   4,978.23 |
|  | CSI Services | $   2,874.00 |
|  | DC Inspections | $  48,768.40 |
|  | **Total** | $ 119,667.87 |

116. Under section 1132(g)(2), plaintiffs are also entitled to double interest on the unpaid contributions, as well as reasonable attorney's fees and costs that arise only from the pursuit of plaintiffs' meritorious claims.

117.  In addition, under section 1132(g)(1), the Court has discretion to award "a reasonable attorney's fee and costs of the action to either party."

**IV.   CONCLUSION**

In accordance with the foregoing, the Court concludes that plaintiffs are entitled to unpaid contributions as set forth in these findings of fact and conclusions of law, as well as double prejudgment interest on these unpaid contributions and attorneys' fees and costs related only to their successful claims.  The parties shall address the issue of attorneys' fees for plaintiffs and potential attorneys' fees for defendant by way of post-judgment motions.

IT IS SO ORDERED.

Dated: July 5, 2013

_____
CHRISTINA A. SNYDER
United States District Judge